1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10

11  IN THE MATTER OF THE          ) NO. CV 16-170-CAS(E)
    EXTRADITION OF               )
12  LYUBOMIR MIHAILOV YORDANOV,  )
    aka "Lyubomire M. Iordanov," ) MEMORANDUM OPINION AND ORDER:
13                               )
                                 ) 1. DENYING FUGITIVE'S MOTION TO
14  a Fugitive from the          )    DISMISS; AND
    Government of Bulgaria,      )
15  _____) 2. CERTIFYING EXTRADITABILITY
16

17

18                    **BACKGROUND**

19

20      The Government of Bulgaria has requested the extradition of

21  Lyubomir Mihailov Yordanov, also known as Lyubomire M. Iordanov

22  ("Yordanov").  Yordanov opposes extradition.

23

24      On December 15, 2015, the Government of the United States

25  ("Government") filed a sealed "Complaint for Arrest Warrant and

26  Extradition" pursuant to 18 U.S.C. section 3184 in In the Matter of

27  the Extradition of Lyubomir Mihailov Yordanov, aka "Lyubomire M.

28  Iordanov," 15-2388M.  Yordanov was arrested in this District on

1  December 18, 2015.

2

3      On January 8, 2016, the Government filed in the present action:
4  (1) a Request for Extradition with exhibits ("Request for
5  Extradition"); and (2) a "Notice to Consolidate" this action with case
6  number 15-2388M.  Also on January 8, 2016, the matter was referred to
7  the undersigned Magistrate Judge.

8

9      On July 29, 2016, the Government filed the "United States'
10 Extradition Memorandum" ("Government's Memorandum").  On October 19,
11 2016, Yordanov filed "Mr. Yordanov's Brief in Opposition to
12 Government's Request for Extradition, etc." ("Opposition").  On
13 October 28, 2016, the Government filed the "United States' Reply in
14 Support of Extradition Request, etc." ("Reply").  On November 3, 2016,
15 the Government filed the "United States' Filing of Supplement to
16 Request for Extradition" ("Government's November 3, 2016 Supplement").

17

18     On November 7, 2016, Yordanov filed "Mr. Yordanov's Sur-Reply
19 Brief in Opposition to Government's Request for Extradition and Motion
20 to Dismiss Request for Extradition" ("Sur-Reply and Motion to
21 Dismiss").  On November 9, 2016, the Government filed the "United
22 States' Opposition to Motion to Dismiss Request for Extradition."

23

24     The Magistrate Judge held an extradition hearing on November 10,
25 2016.

26

27     On November 16, 2016, the Government filed the "United States'
28 Filing of Supplement to Request for Extradition, etc." (Government's

November 16, 2016 Supplement"). On December 13, 2016, Yordanov filed "Mr. Yordanov's Response to Government's Supplement to Request for Extradition" ("Response to Government's November 16, 2016 Supplement").

### YORDANOV'S MOTION TO DISMISS

A criminal charge is pending against Yordanov in the town of Plovdiv, Bulgaria, charging deceit in violation of section 209(1) of the Bulgarian Criminal Code, as amended in 1982 and 1983.

In support of the Request for Extradition, the Government initially provided the following translation of section 209(1):

> Who, with the purpose of obtaining for himself or for somebody else property benefit [sic], arises or maintains aberration [sic] in somebody, thus causing him or somebody else property damage shall be punished by imprisonment from one to six years.

Request for Extradition, Government's Exhibit B, ECF Dkt. No. 10-1, p. 46. In Yordanov's Opposition, Yordanov argued that this translation was unintelligible. <u>See</u> Opposition, pp. 5-7. The Government then attached to its Reply a different, unauthenticated translation of the statute. Yordanov thereafter sought to dismiss the proceeding on the grounds that the new translation was untimely and not properly authenticated. <u>See</u> Sur-Reply and Motion to Dismiss, pp. 2-6. ///

1   Following the hearing on November 10, 2016, the Magistrate Judge
2   issued a Minute Order permitting the Government to file a properly
3   authenticated, accurate translation of the statute and authorizing
4   Yordanov to file a response.  The Government thereafter filed its
5   November 16, 2016 Supplement to which was attached a copy of a new
6   translation of the statute, a sworn certificate of translation and a
7   cover letter from the director of "International Legal Cooperation and
8   European Affairs" of the Bulgarian Ministry of Justice bearing the
9   seal of the Ministry of Justice.  See Government's November 16, 2016
10  Supplement, ECF Dkt. No. 50, Exs. A, B.  This translation of section
11  209(1) reads:

13      A person who for the purpose of acquiring material
14      benefit for himself or for another evokes or maintains in
15      somebody a misleading idea, and thereby causes material
16      damage to that person or to another, shall be punished for
17      deceit by imprisonment from one to six years.

19  Government's November 16, 2016 Supplement, ECF Dkt. No. 50, Ex. A.
20  Yordanov continues to object to the Government's submission of the new
21  translation on procedural grounds.  See Response to Government's
22  November 16, 2016 Supplement, ECF Dkt. No. 52, p. 2.

24      The Court finds that the new translation has been sufficiently
25  authenticated.  See 18 U.S.C. § 3190; Extradition Treaty Between the
26  Government of the United States and the Government of the Republic of
27  Bulgaria, signed at Sofia on September 19, 2007, S. Treaty Doc. No.
28  110-12 (2008) ("Treaty"), Art. 9, Request for Extradition,

4

Government's Ex. A,, ECF Dkt. No. 10, p. 37 ("Documents that bear the certificate of seal of the Ministry of Justice, or Ministry of Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization."). The Court also finds that the timing of the presentation and authentication of the new translation is not fatal to the merits of the Request for Extradition. The Treaty does not necessarily require that all documents submitted in support of a request for extradition be submitted at the same time as the request itself. See Treaty, Art. 8, 9, 10, Request for Extradition, Ex. A; 18 U.S.C. §§ 3184, 3190. The Motion to Dismiss is denied.

## FINDINGS AND CONCLUSIONS RE EXTRADITION

### I. <u>Jurisdiction</u>

This Court has jurisdiction to conduct extradition proceedings pursuant to 18 U.S.C. section 3184, Local Rule 72-1, and General Order No. 05-07 of the United States Court for the Central District of California. The Court has jurisdiction over Yordanov pursuant to 18 U.S.C. section 3184.

### II. <u>Treaty</u>

The Treaty is in full force and effect. See Request for Extradition, Government's Ex. A, ECF Dkt. No. 10, pp. 5-48; Declaration of Julie B. Martin, ¶ 3, Government's Exhibit A, ECF Dkt.

No. 10, p. 5.

**III.   <u>Identity</u>**

The Lyubomir Mihailov Yordanov appearing before this Court is the same Lyubomir Mihailov Yordanov sought by the Government of Bulgaria.

**IV.   <u>Request for Extradition; Procedural Requirements</u>**

The Request for Extradition filed with this Court by the Government of Bulgaria, as augmented by subsequent filings, complies with the procedural requirements of the Treaty.

**V.   <u>Charge</u>**

The charge of deceit is based on allegations that, from May 2008 until August 28, 2008, in the towns of Plovdiv and Krichim, for the purpose of obtaining for himself or another a property benefit, Yordanov allegedly "aroused and sustained deception" in the victim, Yordan Vasilev Angelov, causing property damage "on a large scale" in a sum equivalent to $640,000.  Request for Extradition, Government's

///
///
///
///
///
///
///

6

Ex. B, ECF Dkt. No. 10-1, pp. 24, 33, 42.[1]  Yordanov allegedly violated Bulgarian Criminal Code section 209(1), which (as previously indicated) provides:

> A person who for the purpose of acquiring material benefit for himself or for another evokes or maintains in somebody a misleading idea, and thereby causes material damage to that person or to another, shall be punished for deceit by imprisonment from one to six years.

Government's November 16, 2016 Supplement, ECF Dkt. No. 50, Ex. A. Pursuant to Bulgarian Criminal Code section 210(5), the punishment for "deceit" in Bulgaria is increased to one to eight years if the "caused damage is large in size."  Government's Ex. B, ECF Dkt. No. 10-1, p. 46.

## VI.   Limited Nature of Present Proceedings

In Vo v. Benov, 447 F.3d 1235 (9th Cir.), cert. denied, 549 U.S. 935 (2006), the Ninth Circuit emphasized the very limited role of the court in extradition proceedings.

///

---

[1]  Although the translation of the Pencheva statement describes the charge in terms of Yordanov's having "arisen and maintained aberration" in the victim, the translation of various Bulgarian pretrial orders describe Yordanov as having "aroused and maintained deception" in Angelov.  Compare Government's Ex. B, ECF Dkt. No. 10-1, p. 6 with Government's Ex. B, ECF Dkt. No. 10-1 pp. 24 ("Order" dated July 6, 2012), 33 ("Order, etc." dated June 29, 2012), 42 ("Order for the Opening of Pre-Trial Proceedings," dated April 12, 2010).

1    An extradition court - in this case the magistrate
2    judge-exercises very limited authority in the overall
3    process of extradition.  As we have explained,
4    "[e]xtradition is a matter of foreign policy entirely within
5    the discretion of the executive branch, except to the extent
6    that the statute interposes a judicial function."
7    [citations].  Extradition from the United States is
8    initiated when the nation seeking extradition makes a
9    request directly to the State Department.  [citation].
10   "After the request has been evaluated by the State
11   Department to determine whether it is within the scope of
12   the relevant extradition treaty, a United States Attorney
13   . . . files a complaint in federal district court seeking an
14   arrest warrant for the person sought to be extradited."
15   [citation].  Upon the filing of a complaint, a judicial
16   officer (typically a magistrate judge) issues a warrant for
17   an individual sought for extradition, provided that an
18   extradition treaty exists between the United States and the
19   country seeking extradition and the crime charged is covered
20   by the treaty.  18 U.S.C. § 3184.  After the warrant issues,
21   the judicial officer conducts a hearing to determine whether
22   there is "evidence sufficient to sustain the charge under
23   the provisions of the proper treaty or convention," id., or,
24   in other words, whether there is probable cause.

25

26   Id. at 1237.

27   ///

28   ///

8

1    Thus, in determining whether the crime is extraditable and
2    whether probable cause exists, the Magistrate Judge "has no
3    discretionary decision to make." Prasoprat v. Benov, 421 F.3d 1009,
4    1012 (9th Cir. 2005), cert. denied, 546 U.S. 1171 (2006) (citation and
5    internal quotations omitted).  "If the judge or magistrate judge
6    concludes that 'the crime is extraditable,' and that 'there is
7    probable cause to sustain the charge,' the judge or magistrate judge
8    must certify the extradition." Manta v. Chertoff, 518 F.3d 1134, 1140
9    (9th Cir. 2008) (citation omitted).  "Once a magistrate judge confirms
10   that an individual is extraditable, it is the Secretary of State,
11   representing the executive branch, who determines whether to surrender
12   the fugitive." Blaxland v. Commonwealth Director of Public
13   Prosecutions, 323 F.3d 1198, 1208 (9th Cir. 2003).

14

15   **VII.  Evidence**

16

17       **A.  Government's Evidence**

18

19           **1.  Prosecutor's Statement**

20

21       The Government has submitted a certified translation of an
22   "Information" statement from Plovdiv Public Prosecutor S. Pencheva
23   addressed to the Bulgaria Supreme Cassation Prosecutor's Office,
24   International Legal Cooperation Department (Request for Extradition,
25   Ex. B, ECF Dkt. No. 10-1, pp. 6-9 ("Pencheva Statement").  This
26   statement contains the following information:
27   ///
28   ///

The victim, Yordan Vasilev Angelov, was the sole owner and manager of "SMM" PLCC, a company engaged in the import and sale of cars and other motor vehicles.  Pencheva Statement, ECF Dkt. No. 10-1, p. 6.  In February 2008, Angelov met Yordanov through an acquaintance.  Id.  Yordanov represented that he imported motor vehicles from the U.S. and expressed a desire to develop a common business with Angelov.  Id.  Yordanov and Angelov entered into an oral agreement for the import of motor vehicles.  Id., pp. 6-7.

Initially, Yordanov performed his obligations under the agreement.  Id., p. 7.  Yordanov would send invoices to Angelov describing the characteristics of a particular vehicle (i.e., brand, model, VIN number), and Angelov thereafter would transfer the appropriate purchase amount to a United States bank account.  Id.  Yordanov then would ship the purchased car by container to Bulgaria.  Id.

Commencing in May 2008, Yordanov decided to send Angelov information concerning vehicles which Yordanov did not intend to purchase so as to induce Angelov to transfer money to Yordanov for the allegedly phony purchase.  Id.  Yordanov intended to use the transferred money for his own necessities.  Id.  In pursuit of this plan, from May 2008 until August 29, 2008, Yordanov sent Angelov invoices for nine vehicles: six BMWs, two Mercedes and an Infinity FX35.  Id.  Angelov transferred to Yordanov's American bank account a total of $870,439.43, consisting of $640,000 in payment

1    for the vehicles plus Yordanov's commission.  Id.

2

3        When the vehicles did not arrive in Bulgaria, Angelov

4    repeatedly called Yordanov concerning the reasons for the

5    apparent delay.  Id.  Initially, Yordanov gave various

6    reasons, and later he sent Angelov several container numbers

7    for the containers in which the cars supposedly were to be

8    loaded.  Id.  Upon inquiry, Angelov discovered that the

9    numbered containers actually existed "but were not going to

10   sail."  Id.  Angelov attempted to contact Yordanov, but

11   Yordonov either did not answer the calls or gave various

12   reasons for discontinuing the conversation.  Id.

13

14       Angelov then flew to the United States, accompanied by

15   his "best man" Atanas Ivanov Bubarov,[2] in order to find out

16   why the deliveries had been delayed.  Id.  Yordanov calmed

17   Angelov down, assuring him that everything was in order and

18   that at any moment the vehicles would depart from a port in

19   New York.  Id.  When Angelov said he wanted to check

20   personally on the status of the shipment, Yordanov said that

21   this was not possible because of the ship's supposedly

22   imminent departure.  Id.  After approximately ten days,

23   Angelov returned to Bulgaria to wait for the deliveries.

24   _____

25       [2]   Documents in the record refer to this witness both as
26   "Bubarov" and "Babarov."  See Request for Extradition, Ex. B, ECF
     Dkt. No. 10-1, p. 7; Government's November 3, 2016 Supplement,
27   Ex. A, ECF Dkt. No. 43-1, pp. 2-4; Ex. B, ECF Dkt. No. 43-2, pp.
     2-4.  The Court uses the former spelling, which is the spelling
28   used in the Pencheva Statement.

Id.  Angelov discovered a couple of days later that the
vehicles had not been shipped and that, contrary to
Yordanov's representation to Angelov, Yordanov had never
even purchased the vehicles.  Id., pp. 7-8.

Bubarov thereafter traveled to the United States at the
request of Angelov and met with Yordanov again.  Id., p. 8.
Yordanov confessed to Bubarov that Yordanov never had
purchased the vehicles he had invoiced to Angelov, never had
any intention of doing so, had kept the money Angelov had
transferred and had spent this money for Yordanov's
"personal needs."  Id.  When Bubarov informed Angelov of
this conversation, Angelov contacted the Regional Prosecutor
in Plovdiv.  Id.

### 2.  Witness Statements

The Government also has submitted a translated witness statement
from Angelov and two translated witness statements from Bubarov.

#### a.  Angelov's Statement

In Angelov's statement, taken on March 14, 2013, Angelov stated:

In 2008, Angelov met Yordanov, who told Angelov that
Yordanov owned a company named "ID Emerson" in California.
Government's November 3, 2016 Supplement, Ex. C, ECF Dkt.
No. 43-3, p. 3.  The two agreed that Yordanov would buy cars

in the United States and ship them to Angelov's company "SMM," in return for which Angelov would send payment to Yordanov's company.   <u>Id.</u>   Yordanov owned two companies in Bulgaria which would act as brokers to release the cargo from the port in Varna in return for a commission from Angelov.   <u>Id.</u>

Angelov ordered approximately 20-30 cars per month, by email, ultimately ordering approximately 100 cars, all in the upper price range.   <u>Id.</u>   Yordanov would send invoices by email, after which Angelov would transfer the money for the invoiced cars to Yordanov's company bank account.   <u>Id.</u> Yordanov did not buy the cars with his own funds, but with Angelov's money.   <u>Id.</u>

Yordanov invoiced Angelov for the nine subject cars, and Angelov paid Yordanov for these cars.   <u>Id.</u> pp. 3-4. When the cars did not arrive, Angelov spoke to Yordanov on the phone.   <u>Id.</u>, p. 4.   Yordanov deceived Angelov, saying that Yordanov needed time to obtain the vehicle documents and that the procedure would take a month and a half.   <u>Id.</u> After waiting approximately a month, Angelov notified Yordanov that Angelov was going to come to the United States.   <u>Id.</u>

Angelov traveled to the United States with Bubarov in September or October of 2008.   Yordanov told Angelov that Yordanov had bought the nine cars in New York and the cars

were there in containers.  Id.  When Angelov expressed a
desire to fly to New York to see the cars, Yordanov said
Angelov could not do so because the cars were loaded in
containers.  Id.  Yordanov gave Angelov the numbers of two
of the containers which Yordanov said contained eight cars.
Yordanov said he had made a down payment for one car which
would be shipped in two weeks.  Id.  Angelov checked the
shipping company's website and saw two containers
corresponding to the numbers Yordanov had provided.  Id.
However, a check a week later showed those containers were
cancelled.  Id.

Angelov contacted Yordanov, who said he would check
what was happening.  Id.  Angelov sent Bubarov to the United
States.  Id.  Yordanov told Bubarov that Yordanov had not
bought the cars but had used the money for his own purposes.
Id.  Angelov had sent Yordanov $640,000 for the missing
shipments.  Id..  Later, Yordanov told Angelov that Yordanov
would pay Angelov back within six to twelve months.  Id.
Yordanov's mother, who is in the United States, sent Angelov
$2000.  Id.

### b.  Bubarov's Statements

In Bubarov's first statement, taken on April 30, 2010, Bubarov
stated:

///

///

14

Burbarov, Angelov's "best man," shares an office with Angelov and helps Angelov, an arrangement which ensures that Burbarov is familiar with everything that happens in Angelov's office.  Government's November 3, 2016 Supplement, Ex. A, ECF Dkt. No. 43-1, p. 3.  In early 2008, an acquaintance introduced Angelov to Yordanov.  Id.  Bubarov later met Yordonov and learned that Yordanov was living and working in the United States and had offered to start a business with Angelov importing vehicles from the United States.  Id.  As far as Bubarov knew, Yordanov would send an invoice for a certain car, with the chassis number, and Angelov then would make a bank transfer based on the invoice.  Id.  Bubarov had the impression that the business was going well.  Id.

However, eventually there was a significant delay in shipping a number of expensive cars.  Id.  Burbarov accompanied Angelov to the United States because Burbarov spoke English quite well.  Id.  In the United States, the two met Yordanov, who assured them that everything was all right and that the cars were in stock but that there were some technical problems which were going to be resolved soon.  Id., pp. 3-4.  Bubarov and Angelov spent approximately a week in Los Angeles but never saw the cars, which reportedly were being kept at the New York harbor Id., p. 4.  Yordanov persuaded Bubarov and Angelov not to go to New York.  Id.

///

1       Bubarov and Angelov returned to Bulgaria but the cars

2  never left the United States.  Id.  Bubarov then returned to

3  the United States at Angelov's request and met again with

4  Yordanov.  Id.  When Bubarov asked Yordanov about the cars,

5  Yordanov said he had never bought the cars, but then gave no

6  explanation concerning the money Angelov had sent Yordanov

7  to purchase the cars.  Id.  Yordanov began speaking

8  evasively, promising to return the money he owed.  Id.

9  Bubarov asked Yordanov why Yordanov had issued invoices for

10  cars Yordanov did not own.  Id.  Yordanov initially said he

11  had paid certain amounts for some of the cars but nothing

12  for others, but finally admitted that he had not paid any

13  money but had only called the car owners.  Id.  Yordanov

14  obviously had obtained information about the cars from

15  Internet advertisements.  Id.

16

17       Bubarov returned to Bulgaria.  Id.  Thereafter, Angelov

18  received a few emails from Yordanov promising to return the

19  money.  Id.  Bubarov read some of these emails personally.

20  Id.

21

22  In Bubarov's second statement, taken on March 14, 2013, Bubarov

23  added:

24

25       After the subject vehicles did not arrive, Bubarov and

26  Angelov went to Los Angeles and discussed with Yordanov the

27  fact that vehicles were not arriving.  Government's

28  November 3, 2016 Supplement, Ex. B, ECF Dkt. No. 43-2, p. 3.

1   The two also saw Yordanov's mother, an accountant.  Id.

2   Yordanov confirmed the receipt of money from Angelov for the

3   nine vehicles in question.  Id.  Yordanov said the banks

4   were holding the vehicles' documents for some reason, and

5   said the vehicles were in containers in New York waiting to

6   be loaded.  Id.  Angelov and Bubarov asked to see the

7   documents and the money, but Yordanov said all documents had

8   gone with the vehicles.  Id.  Angelov and Bubarov did not go

9   to New York because Yordanov said that the vehicles were in

10  the duty-free zone and could arrive any time.  Id.  Yordanov

11  provided the numbers of two or three of the containers.  Id.

12  Bubarov and Angelov checked the numbers on the shipping

13  company's website and saw that the containers were

14  certified, but after two days the certifications were

15  withdrawn.  Id.  Bubarov and Angelov "started to suspect

16  that something else was going on."  Id.

17

18      Back in Bulgaria, Bubarov and Angelov waited three

19  weeks, but no shipments arrived.  Id., p. 4.  Bubarov then

20  returned to Los Angeles, where Yordanov said that he had

21  made a down payment but did not own the nine vehicles.  Id.

22  Yordanov said he had to make some payments but would get the

23  cars anyway.  Id.  Yordanov then sent an email saying that

24  he had not acquired the cars, and that he was going to

25  refund Angelov's money, somehow, by the end of the year.

26  Id.  The only payment of which Bubarov is aware is a $2000

27  payment Yordanov's mother sent to Angelov.  Id.

28  ///

1    **B.  Yordanov's Evidence**

2

3        Yordanov has submitted an untranslated letter accompanied by

4    documents purporting to reflect completed vehicle purchase and

5    delivery transactions between Yordanov's company and Angelov's company

6    in 2008, including a bill of lading dated August 12, 2008 (see

7    Opposition, Ex. A, ECF Dkt. No. 39-1).

8

9    **C.  Admissibility Issues**

10

11       Yordanov challenges the admissibility of the Pencheva Statement

12   on the ground that the statement appears to be unsworn and contains

13   hearsay.  However, the Treaty does not require that evidence be sworn.

14   See Treaty, Art. 8, Request for Extradition, Government's Exhibit A,,

15   ECF Dkt. No. 10, p. 35.[3]  Furthermore, "[t]he usual rules of evidence

16   do not apply in extradition hearings and, unless the relevant treaty

17   provides otherwise, the only requirement for evidence is that it has

18   been authenticated."  Manta v. Chertoff, 518 F.3d 1134, 1146-47 (9th

19   Cir. 2008) (noting "our well-established case law that evidence

20   offered for extradition purposes need not be made under oath")

21   (citation omitted); see also Barapind v. Enomoto, 400 F.3d 744, 748

22   (9th Cir. 2005); Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1406 (9th

23   Cir. 1988), cert. denied, 492 U.S. 927 (1989); see generally Collins

24   v. Loisel, 259 U.S. 309, 317 (1922) (unsworn statements of absent

25   _____

26       [3]    Thus, the present case is to be distinguished from In
     re Extradition of Platko, 213 F. Supp. 2d 1229, 1237-38 (S.D.
27   Cal. 2002) in which the applicable treaty (with the Czech
     Republic) expressly required "depositions," i.e., statements
28   "made under oath."

1  witnesses admissible, "although they could not have been received

2  . . . under the law of the state on a preliminary examination");

3  accord In re Extradition of Luna-Ruiz, 2014 WL 1089134, at *4 (C.D.

4  Cal. Mar. 19, 2014).

5

6      Yordanov's hearsay objection also lacks merit.  "[I]t is well-

7  settled in this circuit that evidence is not incompetent simply

8  because it is hearsay."  Mainero v. Gregg, 164 F.3d 1199, 1206 (9th

9  Cir. 1999) (citation omitted); In re Extradition of Luna-Ruiz, 2014 WL

10  1089134, at *4 ("The extradition judge may consider hearsay evidence,

11  unsigned translations of a witness's statements, unsworn statements of

12  absent witnesses, and summaries by the police or prosecutor of a

13  witness's testimony or statement, provided that those documents are

14  properly authenticated and . . . the governing extradition treaty does

15  not require that a witness's statements be executed under oath.")

16  (citations omitted).

17

18      Yordanov also contends the evidence of Yordanov's alleged

19  statement to Bubarov that Yordanov had not bought the vehicles, had no

20  intention to do so and intended to use the money for his personal

21  needs assertedly is unreliable because there allegedly is no

22  indication when this purported conversation occurred.  However, the

23  Government's evidence sufficiently shows the timeline of events.  The

24  Government's evidence shows that the alleged conversation purportedly

25  occurred during Bubarov's second visit to the United States, which

26  assertedly occurred approximately three weeks after Bubarov and

27  Angelov returned from the initial visit to the United States in

28  September or October of 2008.  See Government's November 3, 2016

19

Supplement; Ex. B, ECF Dkt. No. 43-2, p. 4; Ex. C, ECF Dkt. No. 43-3, p. 4.

The Government objects to Yordanov's evidence (Reply, ECK Dkt. No. 42, pp. 21-23). In extradition proceedings, "evidence that explains away or completely obliterates probable cause is the only [defense] evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." Barapind v. Enomoto, 400 F.3d at 749 (citation and quotations omitted); see also Santos v. Thomas, 830 F.3d 987, 992-93 (9th Cir. 2016) (en banc). An extradition court generally does not weigh conflicting evidence and make factual determinations, but determines only whether there is competent evidence to support the belief that the accused committed the charged offense. Barapind v Enomoto, 400 F.3d at 749; Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir.), cert. denied, 479 U.S. 882 (1986).

The distinction between "explanatory" and "contradictory" evidence "is easier stated than applied." Santos v. Thomas, 830 F.3d at 992. Here, the Government's evidence itself suggests a course of performance indicating that Yordanov shipped some cars to Angelov pursuant to invoice(s) during the period from May to August 2008. See Government's November 3, 2016 Supplement, Ex. C, ECF Dkt. No. 43-3, p. 3 (Angelov's statement indicating he allegedly imported approximately 100 cars during this time period). Under these circumstances, the Court has considered Yordanov's "course of performance" evidence and, as discussed herein, the Court nevertheless has decided to certify extraditability. Accordingly, the Court need not and does not

1  adjudicate the merits of the Government's evidentiary objection.

2

3  **VIII.   <u>Extraditability</u>**

4

5       **A.  <u>Dual Criminality</u>**

6

7       "Under the principle of 'dual criminality,' no offense is

8  extraditable unless it is criminal in both countries." <u>In the Matter</u>

9  <u>of the Extradition of Russell</u>, 789 F.2d 801, 803 (9th Cir. 1986)

10 (citation omitted).  "Dual criminality exists if the 'essential

11 character' of the acts criminalized by the laws of each country are

12 the same and the laws are 'substantially analogous.'" <u>Manta v.</u>

13 <u>Chertoff</u>, 518 F.3d at 1141.  The scope of liability need not be the

14 same.  <u>Id.</u>  In determining whether dual criminality exists, the Court

15 must consider "the totality of the conduct alleged." <u>Man-Seok Choe v.</u>

16 <u>Torres</u>, 525 F.3d 733, 737 (9th Cir. 2008), <u>cert. denied</u>, 555 U.S. 1139

17 (2009) (citation and internal quotations omitted).  Neither the names

18 nor the elements of the offenses need be identical. <u>Id.</u>; <u>Manta v.</u>

19 <u>Chertoff</u>, 518 F.3d at 1141; <u>Emami v. United States District Court for</u>

20 <u>the Northern District of California</u>, 834 F.2d 1444, 1450 (9th Cir.

21 1987) (dual criminality exists if the "substantive conduct each

22 statute punishes is functionally identical").  "When the laws of both

23 the requesting and the requested party appear to be directed to the

24 same basic evil, the statutes are substantially analogous." <u>Man-Seok</u>

25 <u>Choe v. Torres</u>, 525 F.3d at 738.

26

27       The Treaty expressly incorporates these principles.  The Treaty

28 defines an "extraditable offense" as an offense punishable under the

1   laws in both States by the deprivation of liberty for a maximum period
2   of more than a year or by a more severe penalty.  Treaty, Art. 2(1);
3   ECF Dkt. No. 10-1, pp. 30.  An offense is extraditable "regardless of
4   whether the offense is one for which United States federal law
5   requires the showing of such matters as interstate transportation, or
6   the use of the mails or of other facilities affecting interstate or
7   foreign commerce, such matters being merely for the purpose of
8   establishing jurisdiction in a United States federal court. . . ."
9   Id., Art 2(3)(b).

10

11      The Government contends that the dual criminality requirement is
12   satisfied because the Bulgarian offense assertedly is analogous to the
13   California crime of grand theft set forth in California Penal Code
14   section 487(a) and to the federal crime of wire fraud set forth in 18
15   U.S.C. section 1343.

16

17      Yordanov advances several arguments against a finding of dual
18   criminality.  Yordanov challenges the alleged extraterritorial reach
19   of Bulgaria's jurisdiction, contending he was not in Bulgaria at any
20   relevant time (Opposition, ECF Dkt. No. 39, p. 14).  According to
21   Yordanov, dual criminality is absent because the Government assertedly
22   has not shown that either California's theft statute or the federal
23   wire fraud statute has extraterritorial application (id., pp. 14-15).
24   Yordanov further contends that the dual criminality requirement is not
25   satisfied because the new translation of Bulgarian Criminal Code
26   section 209(1) assertedly is vague, the statute allegedly does not
27   contain a falsity or reliance element, and the evidence assertedly
28   does not show fraudulent intent or use of the wires (see id., pp. 12-

13; Dkt. No. 42, pp. 8-10).


## 1. <u>Extraterritorial Jurisdiction</u>


The United States extradition statute provides that a warrant of apprehension may issue upon a verified complaint charging the fugitive "with having committed [crimes] within the jurisdiction of any such foreign government. . . ."  18 U.S.C. § 3143.  The Treaty provides:


> If the offense has been committed outside the territory of
> the Requesting State, extradition shall be granted, subject
> to the other applicable requirements for extradition, if the
> laws of the Requested State provide for the punishment of an
> offense committed outside its territory in similar
> circumstances.  If the laws of the Requested State do not
> provide for the punishment of an offense committed outside
> its territory in similar circumstances, the executive
> authority of the Requested State, at its discretion, may
> grant extradition provided that all other applicable
> requirements for extradition are met.

Treaty, Art 2(4).


Yordanov contends that extradition is inappropriate because he allegedly did not commit any crime within the jurisdiction of Bulgaria, and because the Government assertedly has not shown that either California's theft statute or the federal wire fraud statute provides "for the punishment of an offense committed outside United

1  States territory in similar circumstances."

2

3       These contentions fail for several reasons.  First, it is "not
4  mandatory" that this Court decide the issue of whether Bulgaria would
5  have jurisdiction over Yordanov.  <u>See</u> <u>Melia v. United States</u>, 667 F.2d
6  300, 303 (2d Cir. 1981).  Nothing suggests that Yordanov will lack the
7  opportunity to challenge jurisdiction in the Bulgarian courts.

8

9       Second, contrary to Yordanov's apparent argument, United States
10  courts have territorial jurisdiction over frauds committed by persons
11  outside the United States which cause harm within the United States.
12  In <u>Ex Parte Hammond</u>, 59 F.2d 683 (9th Cir.), <u>cert. denied</u>, 267 U.S.
13  640 (1932), an extradition case, the Ninth Circuit held that the crime
14  of obtaining funds by fraudulent misrepresentation is committed at the
15  place where the victim parts with the victim's money.  There, the
16  fugitive argued that he had made the allegedly false statements to the
17  Canadian victim in Chicago, and that he had not obtained any money by
18  false pretenses until the money was deposited into the fugitive's
19  California bank.  The Ninth Circuit rejected these arguments, citing
20  <u>Ford v. United States</u>, 273 U.S. 593, 620-21 (1927) ("(a)cts done
21  outside a jurisdiction, but intended to produce and producing
22  detrimental effects within it, justify a State in punishing the cause
23  of the harm as if he had been present at the effect, if the State
24  should succeed in getting him within its power").  <u>Ex Parte Hammond</u>,
25  59 F.2d at 685-86; <u>see also</u> Case Note, 68 Harv. L. Rev. 1463, 1466
26  (1955) (in extradition contexts, "it has been uniformly held that the
27  court of the place where the victims received the fraudulent
28  communications and parted with the property has territorial

jurisdiction") (citations omitted); People v. Cummings, 123 Cal. 269, 272, 55 P. 898 (1899) (venue proper in county where defendant's fraudulent representations made in another county "had final effect and the offense became complete"); People v. Chapman, 55 Cal. App. 192, 196, 203 P. 126 (1921) ("Without doubt, the crime of obtaining money or property by false pretenses is consummated at the place where the money or property is obtained from the defrauded person, regardless of where the false pretenses may have been made, and therefore the place where the money or property is obtained is the place where, ordinarily, the venue should be laid.") (citations omitted; quoted in Ex Parte Hammond, 59 F.2d at 686); see generally People v. Betts, 34 Cal. 4th 1039, 1046, 23 Cal. Rptr. 3d 138, 103 P.3d 883 (2005) ("a state may exercise jurisdiction over criminal acts that take place outside of the state if the results of the crime are intended to, and do, cause harm within the state") (citations omitted); Hageseth v. Superior Court, 150 Cal. App. 4th 1399, 1414, 59 Cal. Rptr. 3d 385, cert. denied, 545 U.S. 1133 (2005) ("it is not necessary to the 'detrimental effect' theory of extraterritorial jurisdiction that the defendant be physically present in this state during some portion of the time during which his alleged criminal act took place. . . .") (citations omitted).

Here, the Government's evidence indicates that, although Yordanov was in the United States, Yordanov assertedly caused Angelov to part with Angelov's money in Bulgaria.  Additionally, the evidence shows that Yordanov used two of his Bulgarian companies to act as brokers, assertedly in furtherance of the fraudulent scheme.  United States law would punish a fraud committed in similar circumstances.  See United

1  States v. Kazzaz, 592 Fed. App'x 553, 554-55 (9th Cir. 2014), cert.

2  denied, 135 S. Ct. 2388 (2015) (sending checks and transmitting an

3  electronic payment to United States established sufficient nexus to

4  support domestic jurisdiction over mail and wire fraud charges;

5  declining to reach issue of extraterritorial application); accord

6  People v. Cummings, 123 Cal. at 272; People v. Chapman, 55 Cal. App.

7  at 196.

8

9      Third, even assuming arguendo that United States law does not

10 provide for the punishment of an offense committed outside United

11 States territory in "similar circumstances," Yordanov's arguments

12 nevertheless would fail.  The second sentence of the

13 extraterritoriality provision of the Treaty quoted above provides that

14 the executive authority of the Requested State has the discretion to

15 grant extradition even where "the laws of the Requested State do not

16 provide for the punishment of an offense committed outside its

17 territory in similar circumstances."  Thus, the fact (if it is a fact)

18 "[t]hat the offense charged is not a crime in the United States is not

19 necessarily a bar to extradition."  Matter of Assarsson, 687 F.2d

20 1157, 1164-65 (8th Cir. 1982) ("The plain language of this treaty

21 indicates that the executive has discretion to extradite for

22 extraterritorial offenses.") (citations and footnote omitted); Matter

23 of Assarsson, 635 F.2d 1237 (7th Cir. 1980) (same), cert. denied, 451

24 U.S. 938 (1981).  The determination whether to exercise discretion to

25 extradite for an extraterritorial offense is vested in the Executive

26 (i.e., the Secretary of State), not this Court.  See Matter of

27 Assarsson, 687 F.2d at 1164; Matter of Assarsson, 635 F.2d at 1245;

28 see also Vo v. Benov, 447 F.3d 1235, 1247 (9th Cir.), cert. denied,

549 U.S. 935 (2006) ("discretionary decisions are within the province of the Secretary of State and not the extradition magistrate") (citation and internal quotations omitted).

### 2.  Grand Theft Under California Law

California's theft statute provides that "[e]very person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, . . . or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, . . . is guilty of theft."  Cal. Penal Code § 484(a).  With exceptions not relevant here, California Penal Code section 487(a) defines grand theft as theft where the value of the property taken exceeds $950.  Promissory fraud, _i.e._, the making of a promise without the intent to perform, is the equivalent of grand theft by false pretenses.  See People v. Weitz, 42 Cal. 2d 338, 343, 267 P.2d 295 (1954), cert. denied, 347 U.S. 993 (1954) ("a promise made with intent not to perform it is a 'false or fraudulent representation or pretense' within the meaning of the [theft] statute") (citation omitted); People v. Ashley, 42 Cal. 2d 246, 262, 267 P.2d 271 (1954) ("a promise made without intention to perform is a misrepresentation of a state of mind, and thus a misrepresentation of existing fact, and is a false pretense within the meaning of section 484 of the Penal Code.") (citations omitted). "[I]n order to support a conviction in such a case 'it must be shown that the defendant made a false pretense or a representation with intent to defraud the owner of his property, and that the owner was in fact defrauded." _Id._ at 259 (internal quotations omitted).

As indicated above, dual criminality exists if the "substantive conduct each statute punishes is functionally identical."  In Collins v. Loisel, 259 U.S. 309 (1922), the Government alleged that the fugitive had obtained a pearl button in India by false pretenses.  See Collins v. Miller, 252 U.S. 364 (1920) (earlier opinion in the same matter setting forth factual allegations).  The fugitive contended that the transaction was simply a failure to pay a debt.  Id. at 366. On habeas review in the United States Supreme Court, the fugitive argued that the relevant affidavit charged only "cheating," a crime purportedly different from theft by false pretenses.  Collins v. Loisel, 259 U.S. at 311.  The fugitive argued that proof of "cheating" required proof of a "promise of future performance which the promisor does not intend to perform," while proof of "theft by false pretenses" required proof of a false representation of "things past or present." Id. (citation omitted).  The Supreme Court rejected this argument, ruling that the offense charged was extraditable because the "particular act charged [was] criminal in both jurisdictions."  Id. at 312.

Similarly, the act charged herein, an allegedly false promise to ship vehicles, is criminal in both Bulgaria and California.  The Court rejects Yordanov's argument that the phrase in the Bulgarian deceit statute "evokes or maintains in somebody a misleading idea" is impermissibly vague.  See Emami v. United States District Court for the Northern District of California, 834 F.2d 1444, 1449-50 (9th Cir. 1987) (deeming to be an extraditable offense a charge under a German statute providing that a person "who damages the property of another person by producing or maintaining an error through fraudulent

misrepresentation or by distortion or suppression of true facts, with
the intent to obtain an illegal pecuniary benefit for himself or a
third person . . ." is guilty of fraud).  Yordanov also argues that
section 209(1) appears to reach conduct not covered under United
States statutes, contending that the Bulgarian statute does not appear
to require proof of falsity, reliance or intent to harm.  To the
contrary: the statutory phrase "for the purpose of acquiring material
benefit for himself . . . evokes or maintains in somebody a misleading
idea" denotes falsity; the statutory phrase "thereby causes material
damage to that person" denotes reliance; and the combination of these
two statutory phrases effectively denotes intent to harm.

Yordanov also contends that dual criminality does not exist
because the evidence allegedly does not show he intended to defraud
and harm Angelov (Response, ECF Dkt. No. 52, pp. 8-10).  See Manta v.
Chertoff, 518 F.3d 1134, 1142 (9th Cir. 2008) (proper to consider
evidence of intent to defraud "as part of our dual criminality
analysis").  Yordanov argues that the evidence shows only a breach of
contract, i.e., a failure to deliver the cars, coupled with an alleged
promise to return Angelov's money.

As indicated above, under California law, a promise of future
conduct constitutes fraud if made without a present intent to perform.
See People v. Ashley, 42 Cal. 2d at 263-64; People v. Marghzar, 192
Cal. App. 3d 1129, 1140, 239 Cal. Rptr. 130 (1987).  While the mere
failure to perform a promise is not alone sufficient to prove
fraudulent intent, the requisite intent may be inferred from all the
circumstances.  See Manta v. Chertoff, 518 F.3d at 1142 (fraudulent

intent of extraditee could be shown by circumstantial evidence); Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1407 (9th Cir. 1988), cert. denied, 492 U.S. 927 (1989) (extraditee's fraudulent intent could be inferred from alleged transactions and the results thereof); People v. Christenbery, 167 Cal. App. 2d 751, 755, 334 P.2d 978 (1959) (evidence that defendant promised to deliver a car to the victim when he knew he could not procure the car was sufficient to show fraudulent intent). Although the evidence suggests that Yordanov initially may have performed his alleged contractual obligations to ship certain other vehicles, the Government's evidence also shows that: (1) Yordanov did not ship nine vehicles for which Angelov had sent Yordanov money; (2) when Angelov assertedly came to this country to discuss the missing shipments, Yordanov, knowing he had not purchased the subject vehicles, allegedly provided continuing, false assurances of performance; and (3) Yordanov later told Bubarov that Yordanov had not purchased the subject vehicles and that Yordanov had used the money obtained from Angelov for Yordanov's own purposes.[4]  Although Yordanov points to evidence allegedly showing that Yordanov purportedly later promised to repay Angelov and sent Angelov $2000,

---

[4]    Contrary to Yordanov's assertion, the witness statements do not necessarily contradict the relevant statements in the Pencheva Statement.  As indicated above, the Pencheva Statement relates that Bubarov said Yordanov told Bubarov that Yordanov had not purchased the nine vehicles but rather had used Angelov's money for Yordanov's personal expenses.  While Bubarov's statements do not contain some of this specific information, Angelov's statement does indicate that Bubarov told Angelov that Yordanov had said he used the money "for his own purposes."  The fact that both Bubarov and Angelov related in their statements that Yordanov purportedly promised to pay the money back does not contradict the statements that Yordanov told Bubarov he had used the money "for his own purposes."

the Government's evidence, if credited, could support the inference
that Yordanov made false promises of performance with respect to the
subject vehicles.  See People v. Christenbery, 167 Cal. App. 2d at
755; see also People v. Wieger, 100 Cal. 352, 357, 34 P. 826 (1893)
("Neither the promise to repay, nor the intention to do so, will
deprive the false and fraudulent act in obtaining it of its
criminality.  The offense is complete when the property or money has
been obtained by such means, and would not be purged by subsequent
restoration or repayment.") (citations omitted); People v. Silver, 47
Cal. App. 3d 837, 845-46, 121 Cal. Rptr. 153 (1975) (same); United
States v. Treadwell, 593 F.3d 990, 997 (9th Cir.), cert. denied, 562
U.S. 916, 973 (2010) ("While an honest, good-faith belief in the truth
of the misrepresentations may negate intent to defraud, a good-faith
belief that the victim will be repaid and will sustain no loss is no
defense at all.") (citation and internal quotations omitted).

    The Court concludes that Yordanov's alleged acts are criminal in
both Bulgaria and California.  As to the remaining issue of
punishment, the Treaty defines an "extraditable offense" to mean an
offense punishable under the laws in both States by deprivation of
liberty for a maximum period of more than a year or by a more severe
penalty.  Treaty, Art. 2(1), Request for Extradition, Government's Ex.
A, ECF Dkt. No. 10, p. 30 (emphasis added).  In California, the taking
of property of a value exceeding $950 is grand theft.  Cal. Penal Code
§ 487(a).  The punishment for grand theft in California is
imprisonment in the county jail not exceeding one year, or pursuant to
California Penal Code section 1170(h), or a fine not exceeding $5000
or both the fine and imprisonment.  Cal. Penal Code § 489 (emphasis

added).[5]   Section 1170(h), part of California's 2001 Realignment legislation (inter alia providing for the retention of certain classes of convicted inmates in jail custody), provides generally that a felony where the term is not specified in the underlying offense shall be punishable by a county jail term of 16 months, two or three years, and otherwise by imprisonment in the county jail for the term described in the underlying offense.   Furthermore, California Penal Code section 12022.6(a)(2) authorizes a sentence enhancement of two years for the taking of property in the commission or attempted commission of a felony where the amount of the loss exceeds $200,000. For purposes of the dual criminality requirement, the court may consider sentence enhancements.   See, e.g., Joseph v. Hoover, 254 F. Supp. 2d 595, 599-600 (D.V.I. 2003).   Here, the amount of the alleged loss substantially exceeds $200,000.   Therefore, the offense of grand theft in the sum alleged in this case is punishable under the laws of both Bulgaria and California by deprivation of liberty for a maximum period of more than a year.   Dual criminality is established with respect to California's theft statute.

### 3.   Wire Fraud Under Federal Law

The federal wire fraud statute proscribes obtaining money or property "by means of false or fraudulent pretenses, representations, or promises. . . ."   See 18 U.S.C. § 1343.   The Ninth Circuit has held

---

[5]   Thus, grand theft is a "wobbler" which is a felony at the time of commission and which remains a felony until sentencing.   See People v. Valenzuela, 5 Cal. App. 5th 449, 452-53, 209 Cal. Rptr. 3d 860 (2016).

that, for purposes of the dual criminality requirement, fraud by false pretenses "is criminal in the United States under laws punishing mail and wire fraud." Manta v. Chertoff, 518 F.3d at 1141.  Contrary to Yordanov's apparent argument (see Opposition, p. 8), the federal jurisdictional requirements of use of the mail or electronic communications do not constitute the essential elements of the fraud offense, and the absence of these elements in the definition of the foreign crime does not defeat a finding of dual criminality.  See Emami v. United States District Court for the Northern District of California, 834 F.2d at 1450; In re Extradition of Mathison, 974 F. Supp. 2d 1296, 1312-13 (D. Or. 2013).  Moreover, as indicated above, the Treaty expressly provides that an offense is considered an extraditable offense "regardless of whether the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or the use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court. . . ."  Treaty, Art. 2(3)(b), ECF Dkt. No. 10, p. 30) (emphasis added).  In any event, the evidence shows Angelov sent money to Yordanov via wire transfers.  Finally, the severity of the punishment for federal wire fraud easily meets the dual criminality requirement.  See 18 U.S.C. § 1343 ("shall be fined under this title or imprisoned not more than 20 years, or both").  Dual criminality is established with respect to the federal wire fraud statute.

///

///

///

### 4.  Conclusion

For the foregoing reasons, the Court finds that the charged offense is an extraditable offense under the Treaty and the dual criminality requirement is satisfied.

## IX.  Probable Cause Determination

"An extradition proceeding is not a trial; the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial."  Emami v. United States District Court for the Northern District of California, 834 F.2d at 1452.  "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."  Collins v. Loisel, 259 U.S. 309, 316 (1922); Barapind v. Enomoto, 400 F.3d 744, 752 (9th Cir. 2005) (citation and quotations omitted).  An extradition proceeding thus "makes no determination of guilt or innocence," but is "designed only to trigger the start of criminal proceedings against an accused," and "guilt remains to be determined in the courts of the demanding country." Sainez v. Venables, 588 F.3d 713, 717 (9th Cir. 2009), cert. denied, 560 U.S. 958 (2010) (citation and internal quotations omitted).  The country seeking extradition need not produce all of its evidence, and the Magistrate Judge does not determine whether there exists sufficient evidence to convict. Id. at 717; Quinn v. Robinson, 783 F.2d 776, 815 n.41 (9th Cir.), cert. denied, 479 U.S. 882 (1986) (noting "well-established rule that

34

extradition proceedings are not to be converted into a dress rehearsal for a trial") (citation and internal quotations omitted). "[T]he magistrate's function is to determine whether there is any evidence sufficient to establish reasonable or probable cause." Sainez v. Venables, 588 F.3d at 717 (citation, internal quotations and brackets omitted).

Yordanov contends the evidence shows nothing more than a business dispute, emphasizing Yordanov's alleged intent to repay Angelov. However, for the reasons discussed above, the evidence establishes probable cause sufficient to support extradition. The evidence that the parties engaged in a course of dealing during which Yordanov shipped some vehicles in return for Angelov's payments does not foreclose a fraud prosecution based on other evidence that Yordanov: promised to purchase and ship the nine subject vehicles; received the money to do so; failed to do so; made false representations that he had done so; made false assurances that the vehicles were in containers in New York ready for shipment; and made false representations that he would see to it that the cars were shipped. Furthermore, there is evidence that Yordanov used Angelov's money for Yordanov's own purposes and then lied about it. Fraudulent intent reasonably may be inferred from the circumstances presented. As indicated above, Yordanov's alleged promise to repay Angelov does not vitiate the evidence of fraud. The credibility of the witnesses against Yordanov presents a matter for trial in Bulgaria because the reasons suggested by Yordanov to doubt the credibility of these witnesses do not "completely obliterate the evidence of probable cause." See Man-Seok Choe v. Torres, 525 F.3d 733, 740 (9th Cir.

2008), <u>cert. denied</u>, 555 U.S. 1139 (2009) (witness' alleged lack of credibility was "merely a weakness" in the Government's case, and did not "completely obliterate the evidence of probable cause") (citations and quotations omitted); <u>Barapind v. Enomoto</u>, 400 F.3d at 749-50 (same); <u>Shapiro v. Ferrandina</u>, 478 F.2d 894, 905 (2d Cir.), <u>cert. dism'd</u>, 414 U.S. 884 (1973) (evidence bearing on the credibility of a witness' inculpatory statement and on whether the accused actually uttered certain statements was inadmissible in extradition proceeding; that evidence "would in no way 'explain' [or] 'obliterate' . . . the government's evidence, but would only pose a conflict of credibility" which "should properly await trial in Israel.") (Friendly, J.).   In making a probable cause determination, the Court does not weigh conflicting evidence and make factual determinations, but determines only whether there is competent evidence to support the belief that the accused committed the charged offense.  <u>Quinn v. Robinson</u>, 783 F.3d at 815.  The Court finds that the evidence before the Court establishes probable cause to believe that Yordanov committed the crime charged against him.

**ORDERS AND CERTIFICATION**

The Motion to Dismiss is denied.

Based on the above findings, and pursuant to 18 U.S.C. section 3184, this Court certifies that it has found Lyobomir Mihailov Yordanov extraditable to Bulgaria with respect to the charge pending against him in Bulgaria.

///

A warrant may issue for the surrender of Lyubomir Mihailov Yordanov upon the requisition of the proper authorities of the Government of Bulgaria, according to the terms of the Treaty.

IT IS FURTHER ORDERED that Lyubomir Mihailov Yordanov shall remain committed to the custody of the United States Marshal, to be confined without bail until he is surrendered to the Government of Bulgaria pursuant to the applicable provisions of the Treaty.

IT IS FURTHER ORDERED that the attorney for the United States forthwith shall obtain transcripts of all proceedings before this Court and deliver those transcripts to the Clerk of the Court.  The Clerk of the Court shall forward to the Secretary of State a copy of this Order, together with the transcripts and copies of documents on file herein.  The Clerk of the Court also shall file herein a copy of the transcripts of all proceedings before this Court.

IT IS SO ORDERED.

DATED: January 18, 2017.


_____/s/_____
                    CHARLES F. EICK
          UNITED STATES MAGISTRATE JUDGE